UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| RODNEY E. MILLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 3:10-CV-427 CAN |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

On October 14, 2010, Plaintiff, Rodney E. Miller ("Miller"), filed a Complaint against Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), in this Court. On February 23, 2011, Miller filed his opening brief. On May 5, 2011, the Commissioner filed a response. Miller filed a reply on May 24, 2011. This Court has jurisdiction over this matter based on 28 U.S.C. § 636(c) and the consent of the parties.

**I.      PROCEDURE**

On September 25, 2006, Miller filed an application for Disability Insurance Benefits and an application for Supplemental Security Income, alleging disability beginning on January 1, 2005. Miller's claim was initially denied on November 1, 2006, and upon reconsideration on February 26, 2007. Miller then requested a hearing, which took place before an Administrative Law Judge ("ALJ") on April 17, 2009.

On September 11, 2009, the ALJ issued a decision denying Miller's application for benefits. The ALJ found that Miller had not engaged in substantial gainful activity since his alleged onset of disability dated January 1, 2005. Miller suffered from severe impairments including right rotator cuff arthritis with history of partial tear, a history of special education

with borderline functioning and an anxiety disorder, not otherwise specified. However, Miller did not have an impairment or combination of impairments that would meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Subsequently, the ALJ found that Miller had the residual functional capacity ("RFC") to perform work at the light and sedentary exertional levels with a limitation to lifting not more than 10 pounds; no overhead reaching or lifting with the right upper extremity; and a limitation to simple routine tasks. Further, Miller is unable to perform any past relevant work, however, jobs exist in significant numbers in the national economy that Miller can perform. Finally, the ALJ found that Miller has not been disabled from January 1, 2005 through the date of the decision, September 11, 2009.

Miller filed a request for review of the ALJ's opinion with the Social Security Appeals Council on September 22, 2009. Miller's petition for review was denied on July 9, 2010, making the ALJ's opinion the Commissioner's final determination.

## II. ANALYSIS

### A. Facts

#### 1. Physical Health History

Miller was forty-five years old when the ALJ denied his claim for Social Security benefits. Miller stands 5'4" and weighs 142 pounds. He attended school through the 12th grade with the assistance of special education classes. His work history includes custodial work and work as a laborer and an oil changer. For purposes of disability insurance benefits, Miller was insured through June 30, 2009.

In September 2005, Miller injured his right shoulder while at work. He was diagnosed

with a first degree rotator cuff tear[1] with persistent symptoms and received an injection for pain relief. On January 18, 2006, Miller began treatment with Dr. Thomas Magill for chronic right shoulder pain. Dr. Magill ordered an MRI which revealed degenerative changes in the right shoulder. Further, an arthrogram[2] revealed mild enlargement of the shoulder joint affecting the upper portion of the supraspinatus tendon[3] with a diagnosis of rotator cuff tendinitis with acromioclavicular arthritis.[4]

On March 10, 2006, Miller underwent right shoulder surgery and corresponding physical therapy. Between April and August 2006, Dr. Magill administered three rounds of injections and prescribed medication for pain management to treat chronic pain, tenderness and stiffness complained of by Miller.

On December 5, 2006, Miller was diagnosed with gastroesophageal reflux disease.[5] On December 21, 2006, Miller received treatment from Dr. James Serwatka for abdominal pain and bloating. On March 6, 2007, Miller returned to Dr. Magill for chronic shoulder pain and received another injection for pain management.

On February 22, 2007, Dr. J.V. Corcoran completed a physical RFC assessment in

---

[1] A "first degree rotator cuff tear" is a tear of less than five percent of the muscle accompanied by mild pain. A first degree tear is the lowest degree of rotator cuff tears. Dr. Carol L. Otis, *That Painful Pull*, available at http://www.sportsdoctor.com/articles/muscle4.html.

[2] An arthrogram is an X-ray of a joint taken after a contrast material, such as a dye, has been injected into the joint. *Dorland's Illustrated Medical Dictionary*, 123 (26th ed. 1985).

[3] The supraspinatus tendon is the muscle between the shoulder blade and the arm bone. *Id.* at 1277.

[4] Acromioclavicular arthritis occurs when the joint between the collarbone, the shoulder blade, and the arm bone wears thin. *Id.* at 26.

[5] "Gastroesophageal reflux disease" occurs when the contents of the stomach leak backwards from the stomach into the esophagus. *National Center for Biotechnology Information*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001311/.

3

regards to Miller's SSA claim. Dr. Corcoran found Miller to exhibit an exertional limitation of a limited ability to push and/or pull in the upper extremities. Dr. Corcoran also found a manipulative limitation of a limited ability to reach in all directions including overhead. Finally, Dr. Corcoran found Miller's allegations regarding the nature of his symptoms to be credible and supported by medical evidence; however, Dr. Corcoran found Miller's allegations regarding the severity of his symptoms, and the related functional restrictions unsupported by medical evidence.

An April 18, 2007, MRI and arthrogram of the right shoulder revealed a partial thickness tear involving the supraspinatus tendon . A follow-up arthroscopy was performed on July 26, 2007. Miller participated in physical therapy between August 22, 2007 and October 7, 2007. On January 16, 2008, Dr. Magill noted that Miller complained of pain going down the right lateral arm along with shoulder pain with an impression of possible cervical radiculopathy.[6] Between February and March 2008, Dr. Magill treated Miller with injections for persistent shoulder pain. On July 24, 2008, an MRI of the right shoulder revealed a trace effusion[7] of the subdeltoid bursa[8] that may be associated with subdeltoid bursitis; however, there was no evidence of a full-thickness rotator cuff tendon tear.  Also on July 24, 2008, an arthrogram of the right shoulder revealed mild degenerative changes at the right shoulder without arthrographic evidence of a full-thickness rotator cuff tendon tear. Dr. Magill administered another injection on July 29,

---

[6]Radiculopathy is a disease of the nerve roots. *Dorland* at 1109.

[7]Effusion is the escape of fluid into a part or tissue as an exudation or transudation. *Id* at 423.

[8]The Subdeltoid bursa is a fluid sac or sac like cavity between the deltoid and the shoulder joint capsule. *Id.* at 199. Furthermore, subdeltoid bursitis is the inflamation of the subdeltoid bursa. *Id.* at 200.

2008. Finally, Miller was provided with a TENS[9] unit on March 18, 2009, to deal with therapy and pain control.

      2.      <u>Mental Health History</u>

Miller attended high school at New Prairie High School in New Carlisle, Indiana from August 28, 1979 to May 15, 1983. He attended both special education and general education classes. Miller took a differential aptitude test in 9th grade that indicated he was in the 15th percentile in verbal reasoning, the 25th percentile in numerical ability, the 25th percentile in abstract reasoning, the 15th percentile in clerical spelling and accuracy, the 5th percentile in mathematical reasoning, the 30th percentile in space relations, the 40th percentile in spelling, and the 5th percentile in language usage. The school indicated that psychiatric records were not kept at New Prairie High School and instructed Miller to contact LaPorte County Special Education Cooperative at Laporte High School to obtain those records.

In a disability report dated September 25, 2006, the Social Security Administration interviewer noted Miller had difficulty with understanding and memory. On February 3, 2007, Mr. Louis Bromley ("Bromley"), a friend of Miller, completed a third party function report. Bromley indicated that Miller had difficulty with lifting, memory, concentration, completing tasks, understanding, following instructions, and getting along with others. Bromley also indicated that Miller exhibited poor personal hygiene regarding bathing and dressing. Further, Bromley indicated that Miller relied on his mother to remind him to take his medication and for

---

[9]"TENS" stands for transcutaneous electrical nerve stimulation. A TENS unit uses electrical currents to stimulate nerves and relieve pain. Valma J. Robertson, Alex Ward, John Low & Ann Reed, *Electrotherapy Explained: Principles and Practice* (4th ed. 2006).

other areas of supervision. Finally, Bromley opined that Miller would not be able to live alone without the care of his mother.

On February 15, 2007, Miller was referred by the disability determination office to attended a clinical interview and medical status examination with Dr. John T. Heroldt. Dr. Heroldt reported an Axis I diagnosis of anxiety disorder not otherwise specified,[10] no Axis II diagnosis, no Axis III diagnosis, an Axis IV diagnosis of occupational problems, and an Axis V diagnosis of GAF 60 indicating moderate symptoms or difficulty in social, occupational, or school functioning. Dr. Heroldt also opined that Miller is not capable of handling his funds.

On February 20, 2007, Dr. F. Kladder completed a mental RFC assessment. Dr. Kladder observed that Miller was moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to maintain attention and concentration for extended periods. Also on February 20, 2007, Dr. Kladder completed a psychiatric review in which he listed impairments of 12.05 mental retardation based on a history of special education and 12.06 anxiety-related disorders based on an anxiety disorder not otherwise specified.

On January 28, 2008, Miller's social worker, Amy Nieman ("Nieman"), drafted a letter in which she indicated that she had been working with Miller since September 2007, and opined that Miller has problems with depression and anxiety. Nieman further asserted that Miller worries a great deal to the point of being debilitating. Miller also has difficulty completing new tasks and learning new skills due to his symptoms. Finally, Nieman asserted that Miller's problems with anxiety and depression prevented him from being gainfully employed.

---

[10]Dr. Heroldt described an Axis I diagnosis of some type of mixed anxiety-depressive disorder.

### 3. Hearing Testimony

On April 17, 2009, Miller testified that he lived with his mother and that the last time he worked was nine months prior for a duration of two months. He claimed that he quit that job because it required him to use his shoulder more than he was capable. He also testified that his longest job was working as a custodian. Miller complained of ongoing right shoulder problems, including constant sharp pain that is aggravated by lifting and is treated with pain medication that has undesirable side effects, including dizziness, and is ineffective in eliminating the pain. He alleged leg cramping and an inability to stand for eight hours with a walking distance limited to a couple blocks before his legs begin to cramp. He also testified that he could stand for two hours, however, he has no trouble sitting. Miller is limited to lifting ten pounds and reports numbness in his fingers during cold weather due to poor circulation. He is able to attend to his own personal and self care needs and he helps his mother during the day and does some household chores including taking out the garbage and yard work. He is able to drive and drove to the hearing site. However, he stated that he was a slow learner and that he got lost two or three times on the way to the hearing. He also stated that he regularly became lost when attending scheduled meetings with counsel. Socially, he has a few friends and spends time with family. Finally, he testified that he lost his job at Harper College because he was too slow, could not perform the necessary lifting, and that his legs cramped when he switched to cleaning duties.

Also at the hearing, a Vocational Expert (VE) testified that an individual with Miller's age, education, work experience, and RFC would be able to perform the requirements of representative occupations such as a courier/messenger, an inspector, and an assembler.

4. Post Hearing Psychological Examination

A post-hearing psychological evaluation was conducted by Dr. Nancy H. Link, Psy.D., H.S.P.P., on June 2, 2009. Dr. Link made an Axis I diagnosis of depressive disorder not otherwise specified, an Axis II diagnosis of provisional borderline intellectual functioning, an Axis III diagnosis of rotator cuff problems, pain in his side and pain in his legs, an Axis IV diagnosis of economic problems including inadequate finances and unemployment, and an Axis V diagnosis of GAF 60. Additionally, Dr. Link found Miller to exhibit an I.Q. score of 57; however, Dr. Link found that these results "[were] not considered a valid representation of current functioning relative to individuals of comparable age" because Miller did not put forth a good effort. Tr. 421. Furthermore, Dr. Link opined that Miller's adaptive functioning was similar to borderline intellectual functioning; however, Dr. Link qualified this diagnosis as provisional pending an examination of previous IQ scores contained school records not made part of the record. Finally, Dr. Link found Miller's adaptive functioning to be consistent with borderline intellectual functioning as opposed to mild mental retardation.

**B.      Standard of Review**

The standard of review for an ALJ's decision is whether it is supported by substantial evidence and free of legal error. *See* 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). Substantial evidence means such relevant evidence as a reasonable mind might accept to support such a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1972). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his

conclusion. *Haynes*, 416 F.3d at 626. An ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Further, an ALJ's legal conclusions are reviewed de novo. *Haynes*, 416 F.3d at 626.

### C. Miller's Motion for Summary Judgment

To be entitled to benefits under the Social Security Act, Miller must establish that he was "disabled." *See* 42 U.S.C. § 423(a)(1)(D). The Social Security Act defines "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's RFC leaves her unable to perform her past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920; *Briscoe*, 425 F.3d at 352.

If the ALJ finds that the claimant is disabled or not disabled at any step, he may make his determination without evaluating the remaining steps. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If there is an affirmative answer at either step three or step five, then there is a finding of disability. *Briscoe*, 425 F.3d at 352. At step three, if the impairment meets any of the severe impairments listed in the regulations, the impairment is acknowledged by the Commissioner. *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. app. 1, subpart P, § 404.

9

However, if the impairment is not so listed, the ALJ assesses the claimant's residual functional capacity, which in turn is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society under step five. 20 C.F.R. § 404.1520(e). The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. *Id.*

Although Miller has raised several issues, the Court will only address those in which the ALJ has committed an error, specifically the ALJ's credibility finding; and (2) the ALJ's step five finding.

1. The ALJ made an improper credibility finding.

Because an ALJ is in a special position where he can hear, see, and assess witnesses, his credibility determinations are given special deference, and as a result, his credibility determinations will only be overturned if they are patently wrong. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *see also Prochska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (holding "[o]nly if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported. . . can the finding be reversed."). However, as a bottom line, Social Security Ruling 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). While an ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence," an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2001); S.S.R. 96-7p. Also, the ALJ

may not simply recite the factors that are described in the regulations for evaluating symptoms. *Zurawski*, 245 F.3d at 887; S.S.R. 96-7p.

The ALJ discredited Miller's testimony of on-going right shoulder pain, cramping in his legs, poor circulation, and being a slow learner. The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. 34. The ALJ further stated that "[t]he ALJ gives more weight to these determinations that conclude the claimant does not experience disabling limitations that preclude all work [referring to Exhibits 8F; 11F; 12F; 13F] than is given to the testimony at hearing." Tr. 35-36.

The ALJ's explanation is insufficient. The Seventh Circuit has recently held that language identical to that used by the ALJ is unacceptable boilerplate language. *See McClesky v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) An ALJ may not use boilerplate language to dismiss a claimant's testimony as not credible. *Id*. Boilerplate language regarding credibility is meaningless because it provides no insight into how the ALJ considered the claimant's testimony. Without more explanation of how Miller's testimony was inconsistent, the Court cannot uphold the ALJ's determination. The ALJ did not articulate what evidence was inconsistent or unsupportive of Miller's testimony, or explain how the evidence contradicted Miller's testimony. Nor did the ALJ specify what evidence he relied on to find Miller not credible. Indeed, the ALJ summarized Miller's testimony, but did not explain the logical bridge that connected Miller's testimony to a finding that Miller was not credible. Simply put, this Court can only speculate as to the ALJ's reasoning. Consequently, the ALJ's finding that Miller was not credible was not supported by substantial evidence.

## 2. The ALJ's erred in his step five finding.

Miller argues that the ALJ made an erroneous step five finding because there was a conflict between the ALJ's RFC finding and the Dictionary of Occupational Titles ("DOT") jobs indicated by the VE in violation of SSR 00-4p.

> When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. SSR 00-4p.

Furthermore, the ALJ will "[a]sk the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and if the VE's or VS's evidence appears to conflict with the DOT , the ALJ will obtain a reasonable explanation for the apparent conflict." SSR 00-4p. Indeed, the burden of making the relevant SSR 00-4p inquiry is on the ALJ, not the claimant. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) (finding that the "reaching" requirement referenced in the DOT was unclear because it did not specify whether it included reaching above shoulder level, highlighting the type of inconsistency that should have been resolved at the hearing by the ALJ).

In the present case, the ALJ's RFC finding limited Miller to, among other things, "no overhead reaching or lifting with the right extremity." However, the sedentary jobs identified by the VE required lifting, handling, and reaching. According to the DOT, sedentary work is defined as "[e]xerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects including the human body."

Furthermore, lifting is defined as "raising or lowering an object from one level to another."[11] The ALJ failed to inquire as to whether there was a conflict between the VE's testimony, the information contained in the DOT, and the RFC. Under SSR 00-4p, the ALJ had an affirmative duty to make such an inquiry. As a result, the record is unclear as to whether the lifting required by the indicated jobs includes overhead lifting, a requirement incompatible with the ALJ's RFC finding. *See Prochaska*, 454 F.3d at 735. This inconsistency should have been resolved by the ALJ at the hearing. Therefore, on remand the ALJ must determine whether the job requirements identified by the VE are consistent with the definitions in the DOT and Miller's limitations.

## II.   CONCLUSION

The ALJ's determination that Miller was not credible was not supported by substantial evidence. Additionally, the ALJ made an erroneous step five finding by failing to identify and resolve a conflict between the VE's testimony and the ALJ's RFC finding. For these reasons, Miller's motion for remand is **GRANTED** and this case is **REVERSED** and **REMANDED** to the Commissioner for proceedings consistent with this opinion.

**SO ORDERED.**

Dated this 30th Day of June, 2011

S/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge

---

[11]*See Dictionary of Occupational Titles*, http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM